UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Barry Ishmael McReynolds**, | Court File No. |
| Plaintiff, | |
| vs. | **COMPLAINT WITH JURY DEMAND** |
| **State of Minnesota**; **Minnesota State Trooper Zachary Hansen and Troopers Doe 1-6** in their individual and official capacities, | |
| Defendants. | |

## INTRODUCTION

1. This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and under the common law of the State of Minnesota, against the State of Minnesota, Zachary Hansen, Trooper with the Minnesota State Patrol, and Troopers Doe 1-6, in their individual and official capacities.

2. It is alleged that Defendant Troopers made an unreasonable seizure of Plaintiff's person in violation of his rights under the Fourth and/or Fourteenth Amendment to the United States Constitution. It is also alleged that Defendant Troopers engaged in retaliation for Plaintiff's assertion of his First and Fifth Amendment rights and that these violations were committed as a result of policies and customs of the State of Minnesota. It is further alleged that Defendants sexually assaulted Plaintiff and engaged in racial discrimination against Plaintiff in violation of Minnesota state law.

## JURISDICTION

3. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law pursuant to 28 U.S.C. § 1367.

1

## VENUE

4. This Court is the proper venue for this proceeding under 28 U.S.C. § 1391, as the material events and occurrences giving rise to Plaintiff's cause of action occurred within the State of Minnesota.

## PARTIES

5. Plaintiff Barry Ishmael McReynolds ("Mr. McReynolds") was at all material times a resident of Richfield, Minnesota, and of full age.

6. Defendant Minnesota State Trooper Zachary Hansen ("Trooper Hansen" or "Defendant Hansen") was at all times relevant to this complaint a duly appointed and acting Trooper of the Minnesota State Patrol, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota.

7. Defendants Minnesota State Troopers John and Jane Does 1-6 ("Troopers Doe 1-6" or "Defendants Doe 1-6"), whose names are not presently known, were at all times relevant to this complaint duly appointed and acting Troopers of the Minnesota State Patrol, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota.

8. The State of Minnesota, is a municipal corporation and the public employer of the Defendant State Trooper. Defendant State of Minnesota is sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. § 466.02, for the actions of its officers and officials, including Trooper Hansen.

## FACTS

9. On 12/12/2019 about 8:00 pm, Mr. McReynolds, a Black man, was driving Eastbound on Interstate 94 through Saint Paul.

10. On that night, it was snowing.

11. Mr. McReynolds observed that other cars on that stretch of highway had varying amounts of snow buildup on their back bumpers and license plates.

12. Mr. McReynolds was driving his 2002 GMC Yukon.

13. Mr. McReynolds had a passenger in his vehicle.

14. Mr. McReynolds was acting as a good Samaritan in giving his passenger a ride home.

15. Trooper Hansen entered Interstate 94 in the vicinity of Highway 280.

16. Trooper Hansen moved alongside Mr. McReynolds.

17. Trooper Hansen made eye contact with Mr. McReynolds.

18. Trooper Hansen then slowed and shifted lanes to follow Mr. McReynolds.

19. On information and belief, Trooper Hansen saw that Mr. McReynolds was Black.

20. Trooper Hansen activated his emergency lights.

21. Mr. McReynolds pulled over to the margin of the highway near Snelling Avenue.

22. Trooper Hansen approached the driver's window of Mr. McReynolds vehicle.

23. Mr. McReynolds rolled down his window to speak with Trooper Hansen.

24. Trooper Hansen stated that he stopped Mr. McReynolds because snow made his license plate unreadable license plate.

25. Mr. McReynolds offered his license and insurance.

26. Trooper Hansen asked Mr. McReynolds when was the last time he consumed alcohol.

27. Mr. McReynolds stated that he did not drink.

28. Trooper Hansen repeated the question

29. Mr. McReynolds repeated his answer.

30. Trooper Hansen asked if Mr. McReynolds had ever consumed alcohol in his lifetime.

31. Mr. McReynolds repeated that he did not drink.

32. Trooper Hansen said, "You're not going to answer the question, huh?"

33. Mr. McReynolds said that he just didn't drink.

34. Trooper Hansen opened the door of the car.

35. Trooper Hansen asked McReynolds to step out of the car

36. Mr. McReynolds asked the reason why he was stepping out of the car.

37. Trooper Hansen stated that he smelled alcohol.

38. Mr. McReynolds said that this was not him.

39. Trooper Hansen asked if Mr. McReynolds was going to "hop out" or not.

40. Mr. McReynolds asked if he had to hop out.

41. Trooper Hansen told Mr. McReynolds that if he did not get out of the car, Trooper Hansen would remove him from the vehicle.

42. Trooper Hansen asked if Mr. McReynolds if Mr. McReynolds had any weapons on him.

43. Mr. McReynolds said that he did not answer questions, and that he didn't drink.

44. Trooper Hansen said, "You don't answer questions?"

45. Mr. McReynolds said that he does not answer questions but he did not carry weapons.

46. Trooper Hansen asked if Mr. McReynolds was going to give him any problems.

47. Mr. McReynolds said that he did not want any problems either, and that he was just trying to drive a friend home.

48. Trooper Hansen asked, as an officer of the law, was Mr. McReynolds going to give him problems.

49. Mr. McReynolds said that he did not believe so, and that he was not a criminal.

50. Trooper Hansen asked if Mr. McReynolds had warrants.

51. Mr. McReynolds said no.

52. Trooper Hansen asked if Mr. McReynolds had drugs in the car.

53. Mr. McReynolds repeated that he does not answer those questions.

54. Mr. McReynolds asked if Trooper Hansen still wanted him to get out.

4

55. Trooper Hansen gave Mr. McReynolds instructions to step out for a search for weapons.

56. Trooper Hansen had seen no indication that Mr. McReynolds was armed.

57. Mr. McReynolds cooperated with Trooper Hansen's search.

58. Mr. McReynolds asked why he was being searched.

59. Trooper Hansen stated that McReynolds had given him suspicion that he might be carrying a weapon.

60. Trooper Hansen asked what an object in McReynolds pants pocket was.

61. Mr. McReynolds repeated that he does not answer questions.

62. Trooper Hansen said he was investigating McReynolds for DWI.

63. Mr. McReynolds stated that he had done nothing wrong and did not drink.

64. Trooper Hansen repeatedly squeezed Mr. McReynolds groin.

65. Mr. McReynolds was wearing ordinary jeans.

66. Mr. McReynolds said that Trooper Hansen did not need to keep squeezing his groin.

67. Trooper Hansen asked "What is that?" He was referring to Mr. McReynolds' genitalia.

68. Mr. McReynolds stated that was what he was born with. Mr. McReynolds was referring to his genitalia.

69. Trooper Hansen said he did not know what that was.

70. Mr. McReynolds clarified that Trooper Hansen did not know what he meant by what he was born with.

71. Trooper Hansen said he did not know what McReynolds was born with.

72. Trooper Hansen stated that he was not God.

73. Trooper Hansen moved Mr. McReynolds to a position between the cars.

74. Mr. McReynolds observed that his license plate was not obstructed by snow.

75. Trooper Hansen told Mr. McReynolds that he was going to administer a field sobriety test, and that if he did not participate that he would be taken to jail for DWI.

76. Mr. McReynolds participated in the field sobriety test.

77. Trooper Hansen conducted a horizontal nystagmus test for over two minutes, pausing to warm his hands.

78. Trooper Hansen conducted a single-leg balance test.

79. Trooper Hansen conducted a countdown test.

80. Trooper Hansen conducted an estimated time test.

81. Mr. McReynolds insisted that he did not answer questions.

82. Trooper Hansen conducted another horizontal nystagmus test.

83. At no time did Mr. McReynolds show any signs of intoxication.

84. By that time, six other Troopers had arrived on the scene.

85. Mr. McReynolds asked why such a large number of police officers were present.

86. Trooper Hansen said, "It's because of how you are acting. So now you know, next time you get pulled over that's not how you act."

87. Mr. McReynolds said, "How was I acting?"

88. Trooper Hansen said, purportedly quoting McReynolds, "I don't know if I had weapons. I don't know if I had drugs."

89. Mr. McReynolds never said what Trooper Hansen said he had.

90. Mr. McReynolds answered, "I said I don't answer questions."

91. Trooper Hansen said, "Exactly."

92. Another trooper agreed.

93. Trooper Hansen conducted a preliminary alcohol screening test using a hand-held breath machine.

6

94. Mr. McReynolds did not test as intoxicated.

95. Trooper Hansen sent Mr. McReynolds back to his vehicle.

96. Trooper Hansen said that McReynolds had a suspended license and would not be allowed to drive home.

97. Mr. McReynolds did not have a suspended license.

98. Mr. McReynolds' license plate was not obstructed by snow as stated by Trooper Hansen.

99. Despite this, Trooper Hansen issued a citation to Mr. McReynolds, charging him with Driving after Suspension, a violation of MN Stat. §171.24.1 and Plate Covered with Dirt/Snow/Etc., a violation of MN Stat. §169.79.7.

100. The charges for the citation issued by Trooper Hansen were later dropped.

101. As a result of Trooper Hansen's actions, Mr. McReynolds suffered shame, humiliation, and embarrassment.

102. As a result of Trooper Hansen's actions, Mr. McReynolds was forced to attend court appearances and defend himself against the false criminal charges fabricated by Trooper Hansen, which were later dismissed.

103. As a result of Trooper Hansen's actions, Mr. McReynolds suffered severe emotional/psychological trauma, anguish, and distress, including depressed mood, anxiety, fear, insecurity, difficulty sleeping, and diminished quality and enjoyment of life. Mr. McReynolds is receiving mental health therapy as a result of Trooper Hansen's actions.

104. Mr. McReynolds has medical expenses as a result of Trooper Hansen's actions.

## CLAIMS FOR RELIEF

**COUNT 1: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT UNREASONABLE SEARCH AND SEIZURE, AND FAILURE TO PROTECT AGAINST ALL DEFENDANTS**

105. Paragraphs 1 through 104 are incorporated herein by reference as though fully set forth.

106. Defendant Hansen lacked reasonable suspicion to stop Plaintiff under Terry v. Ohio.

107. Defendant Hansen violated Plaintiff's Fourth and/or Fourteenth Amendment rights when he stopped Plaintiff without reasonable suspicion.

108. On information and belief, Defendant Hansen stopped Plaintiff based upon his race.

109. Biased law enforcement based on race violates the Fourteenth Amendment to the U.S. Constitution.

110. Defendant Hansen violated Plaintiff's Fourth and/or Fourteenth Amendment rights when he stopped him based upon his race.

111. On information and belief, the Minnesota State Patrol stops, searches and arrests Black men at a higher rate than white men.[1]

112. On information and belief, the biased stops, searches and arrests are based upon accepted practices within the Minnesota State Patrol.

113. These accepted practices establish a pattern or practice of behavior under Monell v. Dept. of Social Services depriving Black men of their Fourth and/or Fourteenth Amendment Rights.

114. Plaintiff was deprived of his Fourth and/or Fourteenth Amendment rights by this pattern or practice of behavior by the Minnesota State Patrol.

115. Defendant Hansen conducted a search of Plaintiff for weapons without any indication that he might be armed.

116. Defendant Hansen's search of Plaintiff without an indication that he might be armed violated Plaintiff's Fourth and/or Fourteenth Amendment right to be secure in his person from unreasonable searches.

---

[1] Racial Profiling Studies in Law Enforcement: Issues and Methodologies. Information Brief. Minnesota House of Representatives Research Department. June 2000.

117. Defendant Hansen, despite no indication that Plaintiff was armed, conducted an extensive and repeated search of Plaintiff's groin area.

118. Defendant Hansen violated Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure when he conducted an extensive and repeated search of his groin area without cause.

119. Based on the above factual allegations, Defendants Doe 1-6, through their actions, acting under the color of state law, violated Plaintiff's Constitutional right to remain free from unreasonable searches and seizures under the Fourth and/or Fourteenth Amendment to the United States Constitution by failing to protect Plaintiff from Defendant Hansen's unreasonable search and seizure. Defendants Doe 1-6 observed Defendant Hansen's conduct toward Plaintiff and had the means and opportunity to prevent it, but nonetheless failed to protect Plaintiff from Defendant Hansen's actions.

120. As a result of these constitutional violations, Plaintiff suffered damages as aforesaid.

### COUNT 2: 42 U.S.C. § 1983 – FIRST AND FIFTH AMENDMENT RETALIATION AGAINST ALL DEFENDANTS

121. Paragraphs 1 through 104 are incorporated herein by reference as though fully set forth.

122. Defendant Hansen told Plaintiff that his extensive investigation was a result of Plaintiff's refusal to answer his investigative questions.

123. Plaintiff had a right to refuse to answer investigative questions under the Fifth Amendment to the U.S. Constitution.

124. Plaintiff had a right not to engage in compelled speech under the First Amendment to the U.S. Constitution.

125. Being subject to extensive investigation on the roadside during Minnesota winters has a predictable chilling effect on freedom of expression.

126. Defendant Hansen violated Plaintiff's First Amendment Right to freedom of expression when he told him that his treatment was a result of his failure to answer his investigative questioning.

127. A second trooper of the Minnesota State Patrol assented to Defendant Hansen's statement that his extensive investigation was a result of Plaintiff's assertion of his First and Fifth Amendment rights.

128. On information and belief, extensive investigations of persons expressing their First and Fifth Amendment rights is an accepted practice within the Minnesota State Patrol.

129. The Minnesota State Patrol violated Plaintiff's First Amendment rights by a pattern or practice of conducting extensive investigation of persons expressing their First Amendment rights to be free from compelled speech.

130. As a result of these constitutional violations, Plaintiff suffered damages as aforesaid.

### COUNT 3: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT UNREASONABLE SEARCH AND SEIZURE (*MONELL* VIOLATION) AGAINST DEFENDANT STATE OF MINNESOTA

131. Paragraphs 1 through 104 are incorporated herein by reference as though fully set forth.

132. Defendant State of Minnesota equipped State Trooper vehicles with video camera and microphone recording technology prior to December 12, 2019.

133. Prior to December 12, 2019, Defendant State of Minnesota developed and maintained policies and/or customs exhibiting deliberate indifference towards the Constitutional rights of persons in the State of Minnesota or in the custody of the Minnesota State Patrol, which caused the violations of Plaintiff's constitutional rights.

134. It was the policy and/or custom of Defendant State of Minnesota to inadequately supervise and train its employees, including the Defendant Troopers, thereby failing to adequately prevent and discourage further Constitutional violations on the part of its employees.

135. As a result of these policies and/or customs and lack of training, employees of the Defendant

State of Minnesota, including the Defendant Troopers, believed that their actions would not be properly monitored by supervisory employees and that misconduct would not be investigated or sanctioned, but would be tolerated.

136. These policies and/or customs and lack of training were the cause of the violations of Plaintiff's constitutional rights alleged herein.

### COUNT 4: SEXUAL ASSAULT AGAINST DEFENDANT HANSEN UNDER MINNESOTA STATE LAW

137. Paragraphs 1 through 104 are incorporated herein by reference as though fully set forth.

138. Based on the above factual allegations, Defendant Hansen engaged in wrongful, sexual contact when he repeatedly squeezed Plaintiff's groin, without justification.

139. Immediately prior to Defendant Hansen's nonconsensual sexual contact, Defendant Hansen told Plaintiff that if he did not exit the vehicle, Defendant Hansen would remove him from the vehicle.

140. Defendant Hansen's threat constituted coercion to submit to the nonconsensual sexual contact.

141. As a direct and proximate result of this assault, Plaintiff suffered damages as aforesaid.

### COUNT 5: SEXUAL ASSAULT AGAINST DEFENDANT STATE OF MINNESOTA UNDER MINNESOTA STATE LAW

142. Paragraphs 1 through 104 are incorporated herein by reference as though fully set forth.

143. Based on the above factual allegations, Defendant State of Minnesota controlled the interactions between Defendant State Troopers and Plaintiff through its hiring, training, monitoring and supervision of its employees.

144. On information and belief, Defendant State of Minnesota trained its Defendant Troopers conducting intimate searches for weapons without adequate suspicion under the constitution.

145. On information and belief, Troopers of the State of Minnesota had reason to believe that intimate searches without adequate suspicion would be tolerated.

146. As a result of the State of Minnesota's custom allowing Troopers to conduct intimate searches for

weapons without cause, Plaintiff was subjected to coerced sexual contact by Trooper Hansen.

147. As a direct and proximate result of this sexual assault, Plaintiff suffered damages as aforesaid.

## RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a. Issue an order granting Plaintiff judgment against Defendants, finding that the Defendants violated Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution and that Defendants are liable to Plaintiff for all damages resulting from these violations;

b. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants committed the tort of sexual assault under Minnesota state law and that Defendants are liable to Plaintiff for all damages resulting from these torts;

c. Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

d. Award of punitive damages to Plaintiff against all Defendants, jointly and severally;

e. Award of reasonable attorney's fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988;

f. Award of such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

December 29, 2022                By:   s/ Paul J. Bosman
                                                                Paul J. Bosman
                                                                Attorney License No. 0388865
                                                                Attorney for Plaintiff
                                                                2136 Ford Parkway, #5328
                                                                Saint Paul, MN 55116
                                                                Tel: (651) 485-7046
                                                                Email: paul.bosman@gmail.com