## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BARRY ISHMAEL McREYNOLDS,

          Plaintiff,

v.

ZACHARY HANSEN, *Minnesota State Trooper, in his individual capacity*, and TROOPERS DOE 1–6, *in their individual capacities*,

          Defendants.[1]

Case No. 22-cv-3219 (LMP/DTS)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Eric Rice, **Law Office of Eric A. Rice**, **Minneapolis, MN**, for Plaintiff.

Ian Taylor, Jr., Michael P. Goodwin, **Office of the Minnesota Attorney General**, **St. Paul, MN**, for Defendants.

      Plaintiff Barry Ishmael McReynolds ("McReynolds") brought this action under 42 U.S.C. § 1983 alleging that Defendant Zachary Hansen ("Hansen")—at the time, a Minnesota State Patrol trooper—committed constitutional violations during a traffic stop. *See generally* ECF No. 1. Specifically, McReynolds alleges that Hansen: (1) unconstitutionally stopped him because of his race, *id*. ¶¶ 105–20; (2) unconstitutionally searched his person, *id*.; (3) retaliated against him after he refused to

---

[1]     McReynolds originally named the State of Minnesota as a defendant and purported to sue the individual troopers in their official *and* individual capacities. ECF No. 1. On May 15, 2023, the Court dismissed the State as a party and dismissed all claims against the troopers in their official capacities. ECF No. 13 at 4.

answer Hansen's questions in violation of the First Amendment, *id.* ¶¶ 121–30;[2] and (4) battered him during the search in violation of Minnesota law, *id.* ¶¶ 137–41.[3]  Hansen moves for summary judgment, ECF No. 59, arguing that he is entitled to qualified immunity against McReynolds's constitutional claims because the traffic stop and subsequent search were legally permissible, and that McReynolds's battery claim fails as a matter of law, *see generally* ECF No. 61.

Because the stop itself was constitutionally sound, and because McReynolds did not have a clearly established First Amendment right to refuse to answer Hansen's questions, the Court grants Hansen's motion for summary judgment on those claims.  However, because a genuine dispute of material fact remains concerning whether Hansen had reasonable suspicion to search McReynolds, the Court denies summary judgment as to his claims that Hansen unconstitutionally searched and battered him.

---

[2]     McReynolds also brought a Fifth Amendment retaliation claim, but now "does not intend to assert a Fifth Amendment retaliation claim."  ECF No. 69 at 13.  The Court will therefore grant summary judgment on that claim.

[3]     McReynolds initially stylized Count 4 as "sexual assault."  ECF No. 1 ¶¶ 137–41. However, both parties have acknowledged that Minnesota does not recognize a specific cause of action for "sexual assault" and treat his claim as one for battery under Minnesota law.  ECF No. 61 at 22; ECF No. 69 at 13.

# BACKGROUND[4]

## I. The Traffic Stop, Search, and Sobriety Tests

In the evening of December 12, 2019, Hansen was driving a marked highway patrol car when he merged onto I-94 heading east near Snelling Avenue in Saint Paul, Minnesota.[5] ECF No. 62-3, Exhibit C (hereinafter "Def. Ex. C") at 00:00–00:06. As Hansen merged onto I-94's leftmost lane, McReynolds's car drove past Hansen in one of the middle lanes. *Id.* at 00:03–00:06. Hansen thereafter merged directly behind and began following McReynolds's car. Hansen noticed that the car's rear license plate was nearly completely covered by snow. Def. Ex. C at 00:03–00:32; ECF No. 62-1 at 34:18–21. After following McReynolds for a short time, during which McReynolds drifted slightly within his lane of traffic, Hansen activated his squad car lights for less than a second before turning them off. Def. Ex. C at 00:51–00:52. McReynolds immediately activated his right turn signal to indicate that he was pulling over but remained in his lane after Hansen turned off the squad lights. *Id.* at 00:52–00:58. Hansen then activated his lights a second time, and this time left them on, and McReynolds pulled over. *Id.* at 00:59–01:04.

---

[4]    The evidence in this case is relatively narrow, and the Court draws the following background from Hansen's body-worn camera footage (approximately 25 minutes in length), ECF No. 62-3 Exhibit C; cell-phone camera footage taken from inside McReynolds's car (approximately 17 minutes in length), ECF No. 62-3 Exhibit D; deposition transcripts, ECF No. 62-1 and 70-1; and a Minnesota State Trooper internal investigation conducted after the incident, ECF No. 70-2 and 70-3.

[5]    McReynolds asserts that it was "about 8:00 pm," ECF No. 1 ¶ 9, and Hansen variously asserts only that it was "nighttime" or "evening," ECF No. 61 at 3, 22.

Hansen exited his squad car and stopped to clean the snow off the rear license plate before approaching the driver's side window. *Id.* at 01:35-01:43. Hansen then asked for McReynolds's driver's license and asked McReynolds when he had last consumed alcohol, to which McReynolds responded, "I don't drink." ECF No. 62-3, Exhibit D (hereinafter "Def. Ex. D"), at 00:13–00:38. Hansen repeated the question, and McReynolds repeated his answer. *Id.* at 00:39–00:41. Hansen then asked whether McReynolds had ever consumed alcohol, to which McReynolds again stated, "I don't drink." *Id.* at 00:42–00:45. Hansen then said, "you're not going to answer the question, huh?" and opened McReynolds's car door, then asked McReynolds to step out, stating that he was doing so because he "smell[ed] alcohol." *Id.* at 00:46–00:53. McReynolds gestured to his front-seat passenger and said, "That's not on me." *Id.* at 00:55–00:57. Nevertheless, Hansen instructed McReynolds to get out of the car. *Id.* at 00:57–00:59.

As McReynolds took off his seat belt, Hansen asked whether McReynolds had any weapons, to which McReynolds responded, "I don't answer questions," and reasserted that he had not had alcohol. *Id.* at 01:03–01:09. Hansen repeated his question, and McReynolds stated, "I don't carry weapons." *Id.* at 01:14–01:19. Hansen then called for backup and asked whether McReynolds was "going to give [him] any problems," and whether he had any drugs in the car. *Id.* at 01:18–01:45. After McReynolds again said he would not answer the questions, Hansen said, "Oof, alrighty," and told McReynolds to get out of the car because he was going to search McReynolds for weapons. *Id.* at 01:40–02:10.

4

McReynolds complied with Hansen's instructions to exit the car, to stand, and to put his hands up. *Id.* at 01:56–02:20.

During the ensuing pat-down, Hansen repeatedly touched the front of McReynolds's beltline and groin area and asked, "What's that?" to which McReynolds again responded that he would not answer questions. *Id.* at 02:20–02:29. McReynolds then asked why Hansen was conducting the pat-down, and Hansen responded, "Because you're giving me suspicions that you might have a weapon . . . and a possible DWI." *Id.* at 02:30–02:39. Hansen continued his pat-down search of the rest of McReynolds's body but returned to McReynolds's groin area and—apparently feeling something—again asked McReynolds what it was, to which McReynolds answered, "That's what I was born with." *Id.* at 02:52–03:06.

After the pat-down search, Hansen conducted a series of field sobriety tests, culminating in a portable breath test. *Id.* at 3:10–16:44. The test showed McReynolds had a blood alcohol content of zero. ECF No. 62-1 at 102:10–12. While Hansen was conducting the field sobriety tests, several other officers arrived at the scene. McReynolds asked why the other officers had arrived, and Hansen responded, "Just because of how you were acting . . . now you know, next time you get pulled over, that's not how you act." *Id.* at 17:02–17:09. McReynolds asked what Hansen meant, and Hansen said, "Oh, I don't know if I have weapons, I don't know if I have drugs," mimicking McReynolds's earlier responses to Hansen's questions. *Id.* at 17:09–17:13. Ultimately, Hansen issued citations for driving with a suspended license and an obstructed license plate. ECF No. 63 ¶ 4.

## II.    Internal Affairs Investigation and Post-Incident Recollections

Shortly after the stop, the Internal Affairs (IA) division of the Minnesota State Patrol investigated Hansen's actions.  *See* ECF No. 70-3.  Relevant here, Hansen sat for an interview during the IA investigation on February 26, 2020.  *See generally* ECF No. 70-2.  Hansen also later sat for a deposition in this case on June 27, 2024.  ECF No. 62-1.

Regarding the incident, Hansen explained that his interest in McReynolds's vehicle was piqued by the snow-covered license plate and that he also suspected a potential DWI once he noticed McReynolds's car drift in its lane.  ECF No. 70-2 at 4, 6; ECF No. 62-1 at 41:9–12.  Nevertheless, he asserted that he pulled McReynolds over solely because of the snow-covered license plate.  ECF No. 62-1 at 42:14–43:11.  Hansen claimed that McReynolds had "bloodshot watery eyes" and "the odor of alcohol coming from him." ECF No. 62-1 at 49:8–9.  Hansen also noticed that there was a passenger in the vehicle but believed that the smell of alcohol came directly from McReynolds, not the passenger or an open container.  *Id.* at 51:15–53:5.  Further, Hansen stated that McReynolds's repeated assertion that he did not drink was a "giant red flag" because he believed, based on his experience, that it indicated someone might be hiding how much alcohol they had consumed.  ECF No. 70-2 at 10.  Accordingly, because McReynolds purportedly smelled of alcohol and because McReynolds refused to answer whether he recently consumed alcohol, Hansen decided to conduct field sobriety tests.  ECF No. 63 ¶ 2.

Regarding his decision to conduct a pat-down search, Hansen asserted during the internal investigation that he considered McReynolds's refusal to answer whether he was carrying weapons to be "elusive," that McReynolds's elusiveness is what prompted the pat-

down, and that he likely would not have conducted a pat-down search if McReynolds had answered "no" when Hansen asked if McReynolds had weapons. ECF No. 70-2 at 24–25. Hansen also admitted that he had no reason to suspect that there were weapons in the vehicle and acknowledged that he recovered no weapons or drugs from McReynolds. *Id.* at 11, 13.

During his deposition, which was more than four years after the traffic stop, Hansen for the first time asserted that he noticed a "bulge" in McReynolds's groin area while McReynolds was still in the car, and that the bulge led him to suspect McReynolds was carrying a weapon. ECF No. 62-1 at 61:10–25. Notably, however, Hansen was shown video taken from the passenger seat of the car and could not identify the bulge he now asserts existed. *Id.* at 123:7–23. Hansen also asserted that he often encountered individuals carrying weapons in that area of Saint Paul, and that "[i]n that area, that time of night, its more so than would be normally." *Id.* at 64:6–65:11. Thus, Hansen's decision to conduct a pat-down search was based on the observation of a bulge and in consideration of the time of night and the location of the stop. *Id.* at 65:16–66:7. Hansen also asserted that McReynolds's refusal to answer questions was not a "sign of resistance" and made him feel "nothing." *Id.* at 84:23–85:13.

McReynolds, in his deposition, claimed that he and Hansen made eye contact as Hansen merged onto I-94. ECF No. 70-1 at 6:6–9. He also asserted that he answered Hansen's questions that he did not drink alcohol because he, in fact, did not drink alcohol. *Id.* at 17:2–16. Finally, he asserted that Hansen sexually assaulted him during the pat-down

search because Hansen "grabbed . . . my scrotum" and did a "pinching massage." *Id.*
at 27:14–28:11.

## ANALYSIS

Hansen moves for summary judgment and argues first that he is entitled to qualified immunity against McReynolds's constitutional claims. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). First, the Court considers whether "the facts, '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right[.]'" *Id.* at 655–56 (alterations in original) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). Second, the Court considers "whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). While the Court can consider the prongs in either order, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* This is because, even in the qualified immunity context, the Court's role at summary judgment "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). And regardless of the order in which the prongs are considered, the Court "may not deny qualified immunity without answering both questions in the plaintiff's favor." *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (quoting *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014)). But "'[i]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue,' a

district court must deny summary judgment." *Id.* at 1109 (quoting *Morris v. Zefferi*, 601 F.3d 805, 808 (8th Cir. 2010)).

"A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Liberty Lobby*, 477 U.S. at 248, 252). Though the Court reviews the evidence in the light most favorable to the non-moving party, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to survive summary judgment," *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby,* 477 U.S. at 252), and the Court "cannot ignore incontrovertible evidence" that "clearly contradicts" the non-moving party's factual allegations, *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010). Accordingly, when reviewing qualified immunity at summary judgment, a district court "must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe them." *Watson*, 2 F.4th at 1110 (cleaned up) (quoting *O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007)).

I.  **Hansen is Entitled to Qualified Immunity on McReynolds's Race Discrimination and Retaliation Claims**

A.  **Discrimination Claim Under the Fourteenth Amendment**

McReynolds's first claim is that Hansen stopped him because of his race, in violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 69 at 8–9.

"The Equal Protection Clause precludes selective enforcement of the law based on race." *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996). To show that an officer's traffic stop was unconstitutionally based on race, a plaintiff need not show that he or she was stopped "without probable cause or reasonable suspicion," but merely that an officer "exercised his discretion to enforce the traffic laws on account of [his] race." *Johnson v. Crooks*, 326 F.3d 995, 999–1000 (8th Cir. 2003). To do so, the plaintiff must show "both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." *Gilani v. Matthews*, 843 F.3d 342, 348 (8th Cir. 2016) (quoting *Bell*, 86 F.3d at 823).

To prove discriminatory effect, the plaintiff "must normally prove that similarly situated individuals were not stopped or arrested." *Clark v. Clark*, 926 F.3d 972, 980 (8th Cir. 2019) (quoting *Johnson*, 326 F.3d at 1000). Thus, a plaintiff must show that "people of another ethnicity violated the law and the law was not enforced against them," and that the other individuals were "similarly situated 'in all relevant respects.'" *Gilani*, 843 F.3d at 348 (quoting *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009)).

McReynolds's Fourteenth Amendment claim fails because there is no evidence in the record that Hansen failed to stop similarly situated individuals. On this point, McReynolds argues that his vehicle was "unusually singled out" despite "many other vehicles . . . driving in a similar manner," apparently referencing the fact that other cars weaved within their lanes but were not pulled over. ECF No. 69 at 9; *see also id*. at 2 ("Other vehicles around McReynolds and the Defendant also drifted within their lanes in a similar manner."). But McReynolds does acknowledge that his license plate was covered by snow, a violation of Minnesota law which provided Hansen probable cause to stop McReynolds's vehicle. *See* Minn. Stat. § 169.79, subd. 7 (requiring drivers to keep license plates "legible and unobstructed . . . so that the lettering is plainly visible at all times"); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) ("Any traffic violation, however minor, provides probable cause for a traffic stop."). McReynolds does not argue, and a review of the dashcam footage does not show, that any other cars had similarly obstructed license plates. Thus, even if other cars were weaving, McReynolds fails to show that Hansen did not stop individuals that were similarly situated "in all relevant aspects." *Gilani*, 843 F.3d at 348 (citation omitted). This fact alone means that he cannot show an Equal Protection violation. *Johnson*, 326 F.3d at 1000 (dismissing claim where plaintiff "offered no evidence that [defendant] does not stop non-African Americans under similar circumstances"); *Gilani*, 843 F.3d at 348 (similarity of only some characteristics between plaintiff and other individuals was insufficient to show discrimination against plaintiff).

11

Other evidence that McReynolds points out to prove Hansen's discriminatory intent is equally unavailing. For instance, he argues that he made eye contact with Hansen and Hansen therefore knew McReynolds's race, and that Hansen made contradictory remarks after the stop to justify his decision to stop McReynolds. ECF No. 69 at 9. But these "do not directly evidence racial animus," and McReynolds's subjective opinion that he was stopped because of his race is plainly insufficient. *Johnson*, 326 F.3d at 1000 (fact that defendant knew of plaintiff's race was insufficient to establish racial discrimination); *Clark*, 926 F.3d at 980 (noting that "hostile and unprofessional" policework "does not, alone, carry the burden of showing racial discrimination . . . particularly so when the alleged discriminatory acts are consistent with legitimate police work"). In short, McReynolds has not identified anything in the record to show that Hansen stopped him because of his race. Hansen is therefore entitled to qualified immunity.

## B.    Retaliation Claim Under the First Amendment

McReynolds also asserts that Hansen only conducted the pat-down search because Hansen was frustrated with McReynolds's responses to Hansen's questions, in violation of McReynolds's right to free speech under the First Amendment. ECF No. 69 at 11–13.

A First Amendment retaliation claim requires a plaintiff to prove "(1) that he engaged in a protected First Amendment activity, (2) that [a government official] 'took an adverse action that would chill a person of ordinary firmness from continuing in the protected activity,' and (3) that retaliatory animus was a 'but-for cause' of his injury." *Stearns v. Wagner*, 122 F.4th 699, 703 (8th Cir. 2024) (quoting *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023)). But "[e]stablishing the violation itself . . . is only half

the battle. Getting past qualified immunity requires the plaintiff[] to show that it would have been 'sufficiently clear [to] every reasonable official . . . that what [they were] doing violate[d]' the First Amendment." *Molina*, 59 F.4th at 338 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). And the issue must have been put "beyond debate." *Id.* (quoting *Reichle*, 566 U.S. at 664).

Here, it is crucial to differentiate between speech that occurred before the search and speech that occurred after the search, because only speech that occurred *before* the search is relevant to considering what speech Hansen allegedly retaliated against. *See, e.g.*, *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017) (noting that use of an expletive could not support First Amendment retaliation claim in part because "by the time [plaintiff] used the expletive, he had already been removed from his car and handcuffed on the curbside," which constituted the allegedly retaliatory act). Before the search, McReynolds said nothing beyond expressing his desire not to answer Hansen's questions. *See generally* Def. Ex. D at 00:13–01:45. But McReynolds fails to cite, and the Court cannot find, any case holding that expressing a desire not to answer questions posed by law enforcement constitutes protected First Amendment activity. *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) (citation omitted) (plaintiff must cite to a "controlling case or a robust consensus of cases of persuasive authority" because "existing precedent must have placed the statutory or constitutional question beyond debate"). Indeed, courts, if anything, unanimously agree that a First Amendment retaliation claim premised on a refusal to answer questions or talk with police *cannot* overcome qualified immunity precisely because there is "no case that clearly establishe[s] that a person has a First

Amendment right to remain silent when questioned by the police." *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023); *see, e.g.*, *Alexander*, 854 F.3d at 308 (granting qualified immunity where plaintiff verbally declined to answer questions because "[t]he sparse case law that does exist . . . indicates no consensus that a defendant has a First Amendment right not to answer an officer's questions during a stop"); *Koch v. City of Del City*, 660 F.3d 1228, 1244 (10th Cir. 2011) ("[W]e [] have found no authority recognizing a First Amendment right to refuse to answer questions during a *Terry* stop.").

Against this backdrop, McReynolds must do more than summarily assert, as he does, that "[his] statement that he did not prefer to answer questions was also constitutionally protected." ECF No. 69 at 12; *see Alexander*, 854 F.3d at 309 ("It is instructive that [plaintiff] points to no case supporting the contention that there is a clearly established First Amendment right not to answer an officer's questions during a traffic stop."). Indeed, he must show that the alleged right being violated is established "in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 566 U.S. at 665 (internal quotation marks and citation omitted). As McReynolds points to no authority that his refusal to answer questions constitutes protected First Amendment activity, and as courts have generally agreed that there is no such authority, McReynolds cannot show that he engaged in clearly established First Amendment protected activity. The Court must grant qualified immunity to Hansen.

## II.    Hansen is Not Entitled to Qualified Immunity Against McReynolds's Fourth Amendment Claim Because a Genuine Dispute of Material Fact Remains

McReynolds next asserts that Hansen did not have reasonable suspicion to conduct a pat-down search, in violation of the Fourth Amendment's prohibition against unreasonable searches.  ECF No. 69 at 10–11.  Hansen asserts that he is entitled to qualified immunity because he did not violate McReynolds's rights and, even if he did, it was not clearly established that what he did was unconstitutional.  ECF No. 61 at 13–18.  Because both inquiries turn on a genuine dispute of material fact, the Court denies Hansen's request for summary judgment.

### A.    Did Hansen Violate McReynolds's Constitutional Rights?

The Court will first consider whether the facts "show the officer's conduct violated a [federal] right[.]"  *Tolan*, 572 U.S. at 655–56 (alterations in original) (quoting *Saucier*, 533 U.S. at 201); *see Molina*, 59 F.4th at 337 ("In deciding whether the district court should have granted summary judgment, we must answer two questions. First, did the officers violate a constitutional right?"); *see also Est. of Nash v. Folsom*, 92 F.4th 746, 754 (8th Cir. 2024) (quoting *Tolan*, 572 U.S. at 656) ("'Courts have discretion to decide the order in which to' address each prong of the qualified-immunity analysis.").  The Court is mindful, in making this inquiry, to view the facts in a light most favorable to McReynolds, and that the Court must deny summary judgment "[i]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue."  *Watson*, 2 F.4th at 1109 (citation omitted).

It has long been established that, under the Fourth Amendment, an officer may stop a vehicle if the officer has "probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). And once a vehicle is legitimately stopped, an officer needs no additional level of suspicion to order a driver "to get out of the vehicle." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). However, while the officer may order a lawfully detained driver out of a vehicle based on nothing more than the probable cause to stop the vehicle, an officer may not conduct a subsequent "patdown of the driver or a passenger during a traffic stop" unless the officer has a "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Thus, a pat-down search of a driver is unconstitutional *unless* it is supported by a reasonable suspicion that the driver is armed and dangerous. *Schaffer v. Beringer*, 842 F.3d 585, 593 (8th Cir. 2016) (holding that "[b]ecause the officers had no reason to believe that [the driver] posed any danger to them," they were not allowed to conduct a pat-down search unless some other warrant exception applied); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 460 (8th Cir. 2011) ("[W]e conclude a reasonable officer could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety.").

A "reasonable suspicion" exists when "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Moreno*, 988 F.3d 1027, 1031 (8th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "[T]he level of suspicion necessary to constitute reasonable suspicion that will . . . justify a protective pat-down search . . . 'is obviously less

16

demanding than that for probable cause.'" *Id.* (quoting *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002)). And in assessing whether an officer had a reasonable suspicion, the Court must consider "the totality of the circumstances," *id.* at 1031 (citation omitted), but limited only to "'what the officer reasonably knew at the time' rather than assessing the existence of reasonable suspicion 'with the vision of hindsight,'" *United States v. Jimenez*, 75 F.4th 848, 852 (8th Cir. 2023) (quoting *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020)).

Here, Hansen points to three facts justifying his pat-down search: (1) his claimed observance of a bulge near McReynolds's waistline; (2) that McReynolds originally responded that he would not answer whether he had weapons but later changed his answer to deny that he had weapons; and (3) Hansen's experience encountering armed individuals at night in the area where Hansen pulled McReynolds over. ECF No. 61 at 12–15; ECF No. 73 at 5–6.

If this is all true, Hansen's search was undoubtedly supported by reasonable suspicion. *See Moreno*, 988 F.3d at 1032 ("We find that Sergeant Meola was warranted in performing a brief protective search to determine whether, in fact, the bulge at Moreno's side was a weapon or bomb."); *Roggeman*, 279 F.3d at 579 (collecting cases explaining that "[w]hen determining whether the totality of the circumstances gave rise to reasonable suspicion justifying a protective *Terry* search," courts "consider a law-enforcement officer's observation of a bulge to be a substantial factor"); *United States v. Brooks*, 2 F.3d 838, 842 (8th Cir. 1993) (finding reasonable suspicion to pat down an individual based, in part, on an observation of a "bulge in his pocket").

17

The problem for Hansen, though, is that the Court cannot assume the truth of Hansen's proposed facts, at least not at this stage where there is contradictory evidence. Instead, the Court "must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe [them]." *Watson*, 2 F.4th at 1110. Here, it is undisputed (1) that McReynolds initially refused to answer questions about whether he had a weapon, (2) that he later outright denied that he carried weapons, and (3) that it was nighttime in an area where Hansen had encountered other armed individuals. But McReynolds disputes the existence of a "bulge" in his waistline. ECF No. 69 at 10. The question, then, is whether that fact is genuinely disputed.

The only evidence that a bulge existed comes from Hansen's deposition statement that he observed a bulge. ECF No. 62-1 at 65:16–66:7. Of course, that testimony is not irrelevant. *See Moore v. Indehar*, 514 F.3d 756, 761 (8th Cir. 2008) (noting that an officer's "sworn deposition testimony describing the incident constitutes some evidence regarding his intentions"). But it also does not end the inquiry because at summary judgment the Court "may not simply accept what may be a self-serving account by the police officer" but "must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Stanton v. Elliott*, 25 F.4th 227, 235 (4th Cir. 2022) (explaining that at

summary judgment, a court "cannot simply accept the trooper's statements as true given potentially contradictory physical evidence").

There is other evidence in the record that arguably contradicts Hansen's account and seems to create a genuine dispute of fact. For instance, the video of the incident shows no bulge, a fact even Hansen acknowledges. ECF No. 62-1 at 123:7–23. And, notably, Hansen himself only claimed he observed a bulge for the first time in his deposition testimony—four years after the incident—but did not articulate that observation during the investigation conducted just months after the incident. *See generally* ECF No. 70-2. In fact, during that investigation, Hansen proffered only one reason justifying his decision to conduct a pat-down: that McReynolds was "elusive" in answering Hansen's questions. *Id.* at 24–25. Further, Hansen did not recover anything from McReynolds's groin area, which would have provided circumstantial evidence supporting his claimed observation. And there does not appear to be video recording of any discussion of a bulge between Hansen and McReynolds or a similar discussion between Hansen and any subsequent law enforcement officers who arrived on scene. Taken together, the *only* way the Court could conclude that a bulge existed is by crediting Hansen's deposition testimony in the face of McReynolds's assertion that no bulge existed. But such a credibility determination is appropriately left to a jury. It is not for the court. *See Garcia v. City of New Hope*, 984 F.3d 655, 666 (8th Cir. 2021) (citation omitted) (reversing grant of qualified immunity where officer and individual had conflicting stories because "it is not our function to remove the credibility assessment from the jury"), *abrogated on other grounds by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023); *Coker v. Ark. State Police*, 734

F.3d 838, 843 (8th Cir. 2013) (reversing grant of qualified immunity because "[w]ithout the aid of video or an understandable audio recording, it is impossible to determine what happened . . . without weighing [the officer's] version of events against [the plaintiff's] story"); *accord Tolan*, 572 U.S. at 656 (quoting *Liberty Lobby*, 477 U.S. at 249) ("[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'").

Hansen argues that McReynolds fails to show a genuine dispute because McReynolds relies on nothing more than "speculation" that a bulge did not exist. But Hansen ignores the circumstantial evidence noted above. And that circumstantial evidence is crucial in a situation like this, where Hansen asks McReynolds to prove a negative—that is, that a bulge *did not* exist. In such a case, circumstantial evidence and an outright denial are often the only evidence a plaintiff can muster. *See Grady v. Becker*, 907 F. Supp. 2d 975, 982 (D. Minn. 2012) (finding genuine dispute as to whether a police officer gave a warning from the fact that the plaintiff asserted that he did not hear one); *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020) ("[T]he plaintiffs' inability to conclusively prove a negative (i.e., that Mr. Smart did not brandish or shoot a gun) does not prevent their evidence from creating a genuine dispute of fact."); *cf. Am. Boat Co. v. Unknown Sunken Barge*, 418 F.3d 910, 914 (8th Cir. 2005) ("In cases involving lack of notice, there is often little a party can do except swear he or she did not receive the communication."). And, importantly, it is Hansen's burden as the moving party at this summary judgment stage to show that no genuine dispute exists. *See* Fed. R. Civ. P. 56(a). In support of his assertion, Hansen proffers only his own deposition testimony. A jury,

though, could reasonably determine that testimony is not credible given the lack of corroborating evidence. *See, e.g.*, *Garcia*, 984 F.3d at 666 (finding genuine dispute as to whether a license plate was covered where "the record contain[ed] a blurry and thus unhelpful video, the officers' testimony that the license plate was unlawfully covered, and [the plaintiff's] testimony that it was not covered"). Thus, the Court finds there is a genuine dispute concerning the existence of a bulge in McReynolds's groin area.

The Court must next consider whether the "genuine issue of fact" is "material—that is, affecting the outcome of the suit under the applicable law." *Watson*, 2 F.4th at 1110. In this case, the Court must construe the genuine dispute—whether a bulge existed—in McReynolds's favor and accept his assertion that no bulge existed. *Garcia*, 984 F.3d at 664 (holding that in "usual qualified immunity cases" where the record does not disprove the plaintiff's contentions of fact, "viewing the facts in the light most favorable to the nonmovant means adopting the plaintiff's version of the facts") (quoting *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018)). Thus, the question is whether, without the existence of a "bulge," Hansen nevertheless had reasonable suspicion to conduct the pat-down search of McReynolds.

Taking away the existence of the bulge, the Court considers the remaining undisputed facts: (1) that McReynolds initially refused to answer questions about whether he had a weapon, (2) that he later outright denied that he carried weapons, and (3) that it was nighttime in an area where Hansen had encountered other armed individuals. Such circumstances are, in theory, relevant to a totality-of-the-circumstances analysis. *See United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995) ("Factors that may reasonably

lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."); *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015) (considering circumstances such as the time of day and location when considering the lawfulness of a pat-down search). But those circumstances do not survive serious scrutiny here.

First, the fact that Hansen pulled McReynolds over in an allegedly high-crime area has little relevance considering that McReynolds was not "loitering" in that area or otherwise engaged in suspicious activity. *See id.* (defendant was loitering in high-crime area); *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("Mere presence in an area known for high crime does not give rise to reasonable suspicion."); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citation omitted) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Indeed, McReynolds was not even *in* a particular neighborhood but was traveling along one of the busiest sections of one of Minnesota's most well-used interstates—I-94. And, second, around 8 p.m. is not a particularly unusual time to be traveling, to put it lightly. *Trogdon*, 789 F.3d at 909–10 (finding reasonable suspicion based in part on defendant's loitering at 1 a.m. in a suspicious area); *United States v. Quinn*, 812 F.3d 694, 696, 698 (8th Cir. 2016) (noting that defendant's presence at "3:10 a.m." near scene of a crime was suspicious); *United States v. McMillion*, 101 F.4th 573, 577 (8th Cir. 2024) (finding reasonable suspicion where officers "responded to a 4:40 a.m. call from the security guards at a notoriously high-crime apartment complex"). Finally, Hansen's argument that McReynolds provided "evasive"

answers to Hansen's questions is not well-taken.  McReynolds initially refused to answer Hansen's question about whether he was carrying any weapons but, seconds later, changed his answer to deny that he was carrying weapons.  Hansen himself stated that he likely would not have conducted the search of McReynolds had McReynolds simply denied carrying weapons, ECF No. 70-2 at 24-25, and stated in his deposition that McReynolds's refusal to answer questions made him feel "nothing" and did not suggest a "sign of resistance,"  ECF No. 62-1 at 84:23-85:13.  It is difficult to see, then, how McReynolds's decision to inform Hansen that he was not carrying weapons would have done anything more than quell Hansen's suspicion.  Regardless, even if McReynolds's shifting answer was suspicious, the "totality of the circumstances" does not rise to the level necessary to support a pat-down search here.

In totality, Hansen argues that McReynolds's presence at 8 p.m. on one of Minnesota's most heavily trafficked interstates, and McReynolds's somewhat defiant answers to Hansen's questions, justified Hansen's decision to conduct a pat-down search. Though the Court is "mindful of the need to credit law enforcement officers who draw on their experience and specialized training," *United States v. Jones*, 606 F.3d 964, 967 (8th Cir. 2010), "[t]here are limits . . . to how far police training and experience can go towards finding latent criminality in innocent acts," *Johnson v. Campbell*, 332 F.3d 199, 208 (3rd Cir. 2003).  To sanction Hansen's pat-down search on the totality of the conduct here would be to sanction the pat-down search of almost anyone pulled over while driving on I-94 in the evening.  That is a bridge too far.  *See United States v. Gray*, 213 F.3d 998, 1001 (8th Cir. 2000) (citation omitted) ("Too many people fit this description for it to justify a

reasonable suspicion of criminal activity."); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (holding there is no reasonable suspicion if "circumstances describe a very large category of presumably innocent travelers"); *United States v. Crawford*, 891 F.2d 680, 682 (8th Cir. 1989) (finding no reasonable suspicion where defendant's "conduct [was] typical of countless innocent people"). Here, the unremarkable location of the stop and time of night are simply not enough to justify a pat-down search.

Accordingly, because reasonable suspicion *would* exist if Hansen observed a bulge, but *would not* exist if there was no bulge, the constitutionality of Hansen's pat-down search is dependent on a genuine dispute of material fact. Thus, the Court cannot grant summary judgment to Hansen on the first prong of the qualified-immunity analysis.

### B.    Was the Right Clearly Established?

The second prong of the qualified-immunity analysis asks whether the violated right "was clearly established at the time of the deprivation." *Watson*, 2 F.4th at 1109 (citation omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Thurmond*, 972 F.3d at 1012 (citation omitted). In determining whether clearly established law exists, the Court "look[s] for a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (internal quotation marks and citation omitted).

It is clearly established that a pat-down search unsupported by a reasonable suspicion that an individual is armed and dangerous is prohibited. *See* Analysis,

Section II.A, *supra*; *see also Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) ("[I]t [is] clearly established that every pat-down is unreasonable unless it is supported by the officer's reasonable suspicion that the person to be frisked is armed and dangerous."); *Lucero v. Bush*, 737 F. Supp. 2d 992, 1004 (D.S.D. 2010) (noting that in 2006, "the law was clearly established that a police officer was entitled to perform a pat-down search only if an objectively reasonable officer held a reasonable suspicion a person with whom the officer comes in contact may be potentially armed and dangerous").

But the Court must not view the "clearly established" prong under a high level of generality.  Instead, "[t]his second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition."  *El-Ghazzawy*, 636 F.3d at 459 (citation omitted).  Thus, specific to Fourth Amendment claims, the Court must look at the facts and additionally determine whether an officer had "*arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed [he] had reasonable suspicion."  *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).  This is because "there is no litmus test to determine when an officer's conduct exceeds the confines of *Terry*."  *El-Ghazzawy*, 636 F.3d at 459.  Accordingly, "[i]n determining whether a right is clearly established, we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* (citation omitted); *see also Tolan*, 572 U.S. at 657 (internal quotation marks and citation omitted) ("In cases alleging unreasonable searches or seizures, we have instructed that courts should define the clearly established right at issue on the basis of the specific context of the case.").

The Court may not, however, "resolve genuine disputes of fact in favor of the party seeking summary judgment," even at the "clearly established" stage of the inquiry. *Tolan*, 572 U.S. at 656 (citations omitted). "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657 (citation omitted). Here, because the Court finds a genuine dispute regarding whether a bulge existed, the Court must consider whether it was clearly established that, without the bulge, Hansen's pat-down was unreasonable. Without that fact, no officer in Hansen's position would have a reasonable suspicion that McReynolds was armed and dangerous. While Hansen cites cases which consider factors such as the time of day, location of interaction, and suspicious behavior, ECF No. 61 at 15, the Court has already explained why those factors and those cases are of little use here. Thus, without more, Hansen did not have "arguable" reasonable suspicion that McReynolds was armed and dangerous, and the Court therefore concludes that Hansen's alleged conduct violated McReynolds's clearly established right to be free from unreasonable searches.

Hansen alternatively argues that it was not clearly established that he could not search McReynolds's groin area specifically. ECF No. 61 at 17–18. This is true generally as courts routinely authorize an officer to conduct a pat-down search of any area "necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26). But Hansen's argument fails to grasp that he would only be entitled to search McReynolds's groin area if he had a reasonable suspicion that McReynolds was armed and dangerous in the first place. *See Johnson*, 555 U.S. at 327. Because that determination rests on a genuine

dispute of material fact, the Court cannot say whether Hansen's decision to search McReynolds's groin was reasonable.

Accordingly, because a genuine despite of material fact exists, the Court denies Hansen's request for qualified immunity against McReynolds's Fourth Amendment claims.

### III.    Hansen is Not Entitled to Qualified Immunity Against McReynolds's Battery Claim Because a Genuine Dispute of Material Fact Remains

In Minnesota, "[b]attery is an intentional, unpermitted offensive contact with another." *Waters*, 921 F.3d at 743 (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)). But "only the use of *excessive* force by a police officer will constitute a battery." *Id.* (quoting *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984)).

Here, Hansen argues that the battery claim fails as a matter of law because Hansen's search was "not offensive because it was objectively reasonable and did not constitute excessive force." ECF No. 61 at 22. However, the excessive force standard presumes that the officer's contact was legally justified in the first place. *See Adewale v. Whalen*, 21 F. Supp. 2d 1006, 1016 (D. Minn. 1998) (emphasis added) (citing *Peterson*, 358 N.W.2d at 485) ("Police officers may come into contact with individuals *for legitimate purposes*; thus, the use of force by an officer must be excessive to constitute battery."); *see also Morris*, 453 N.W.2d at 40–41 (emphasis added) ("[A]n officer in the circumstances here existing was *permitted by law* to apply handcuffs. Thus, the contact with the complainant during the course of applying the handcuffs only became [battery] if the officer used 'excessive force.'"); *Ward v. Olson*, 939 F. Supp. 2d 956, 964 (D. Minn. 2013) (emphasis added)

27

(citation omitted) ("Under Minnesota law, police officers may use reasonable force to *execute their duties*.").

The Court has already held that a genuine dispute of material fact precludes the Court from holding, at this summary judgment stage, that Hansen's pat-down search was reasonable and therefore legally permissible. And if the search was not legally permissible, Hansen had no justification to search McReynolds, and particularly no reason to search McReynolds's groin. Because the Court cannot conclude that Hansen's search was legally justified, it likewise cannot conclude that McReynolds's battery claim fails as a matter of law. *See id.* (holding that because material fact disputes precluded summary judgment on the plaintiff's excessive-force claim, summary judgment was also inappropriate on the plaintiff's battery claim).

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Hansen's Motion for Summary Judgment (ECF No. 59) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1.    Hansen's Motion for Summary Judgment is **DENIED** with respect to Counts 2 and 4 (McReynolds's Fourth Amendment unreasonable search and Minnesota state-law battery claims).

2.     Hansen's Motion for Summary Judgment is **GRANTED** with respect to Counts 1, 3, and 5 (McReynolds's Fourteenth Amendment discrimination and First and Fifth Amendment retaliation claims).    These claims are **DISMISSED WITH PREJUDICE**.


Dated: April 10, 2025                    *s/Laura M. Provinzino*
                                        Laura M. Provinzino
                                        United States District Judge